# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

JOSEPH W. BOSWELL, III,

        Plaintiff,

v.                                 CIVIL ACTION NO.   5:14-cv-15498

BORESHA INTERNATIONAL, INC., and
CORNERSTONE MARKETING, LLC,

        Defendants.

### MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Defendant Boresha International, Inc.'s Motion to Dismiss or Alternatively Transfer Venue* (Document 10),[1] and accompanying *Memorandum of Law in Support of Defendant Boresha International, Inc.'s Motion to Dismiss or Alternatively Transfer Venue* (Document 11), filed on May 27, 2014, as well as the *Plaintiff, Joseph W. Boswell, III's Memorandum of Law in Response and Opposition to Defendant's Motion to Dismiss or*

---

[1] The Defendant attaches the following as exhibits to its motion to dismiss: (1) a fifteen page copy of an Affidavit of Len Di Giovanni, dated May 26, 2014 (Exhibit A, Document 10-1); (2) a thirteen page copy of Boresha's Policies and Procedures, undated (Exhibit B, Document 10-2); (3) a two page copy of Boresha's Independent Marketing Consultant Application, dated February 26, 2014 (Exhibit C, Document 10-3); (4) a seven page copy of the November 27, 2007 Stock Ownership Agreement Summary Page, dated December 3, 2012, and signed by two out of the three signatories (Exhibit D, Document 10-4); (5) a two page copy of the December 1, 2008 Letter Agreement, signed by both signatories (Exhibit E, Document 10-5); (6) a two page copy of the July 29, 2009 Letter Agreement, unsigned (Exhibit F, Document 10-6); (7) a two page copy of the December 11, 2012 Advisory Opinion Letter re Policy and Procedures, dated December 11, 2012, and bearing signatures of the two addressees (Exhibit G, Document 10-7); (8) an eight page copy of the Memorandum of Understanding (MOU), dated March 13, 2014, and signed by all signatories (Exhibit H, Document 10-8); (9) a two page copy of two news reports (February 10, 2014 and May 22, 2014, respectively) concerning Joseph Boswell (Exhibit I, Document 10-9); (10) a four page copy of the April 8, 2014 letter from Boresha to the Plaintiff and his attorney re: the MOU (Exhibit J, Document 10-10); (11) a four page copy of the April 10, 2014 letter from Boresha to the Plaintiff and his attorney re: the MOU (Exhibit K, Document 10-11); and (12) a eleven page copy of the Affidavit of Joseph Juliano, dated May 27, 2014 (Exhibit L, Document 10-12).

*Alternatively Transfer Venue* (Document 13),[2] filed on June 10, 2014, and the *Reply in Support of Defendant Boresha International, Inc.'s Motion to Dismiss or Alternatively Transfer Venue* (Document 16),[3] filed on June 17, 2014. The Court has also considered Defendant Cornerstone Marketing, LLC's *Joinder in Motion to Dismiss or Alternatively Transfer Venue* (Document 14) filed on June 16, 2014. After careful consideration of the *Complaint* (Document 1) and the parties' written submissions, the Court finds that the Defendant's motion should be granted in part and denied in part.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action arises out of a marketing distribution relationship between Plaintiff Joseph W. Boswell, III (Mr. Boswell) and Defendants Boresha International, Inc. (Boresha).

---

2        The Plaintiff attaches a seven page copy of the Affidavit of Joseph W. Boswell, III, and Statement of Facts by Joseph W. Boswell, III, dated June 10, 2014, as his primary exhibit (Exhibit A, Document 13-1). He then attaches the following as exhibits to his affidavit and statement of facts: (1) a one page copy of the Exhibits to Affidavit of Joseph W. Boswell, III, and Statement of Facts by Joseph W. Boswell, III, undated (Document 13-2); (2) a two page copy of a brochure on SkinnyScience products, undated (Exhibit A-I, Document 13-3); (3) a one page copy of a letter from Boresha to Plaintiff re: award of company stock, dated December 29, 2009 (Exhibit A-II, Document 13-4); (4) a seven page copy of a Memorandum of Understanding and Member Unit Purchase Agreement between US Health Science Products, Inc., and Mr. Joseph W. Boswell, III, dated December 16, 2013, and bearing the signatures of two out of the three signatories (Exhibit A-III, Document 13-5); (5) a two page copy of an email from Boresha to the Plaintiff re: sale of goods, dated June 3, 2014, as well as a copy of the shipping label, dated June 3, 2014, from Boresha to Plaintiff (Exhibit A-IV, Document 13-6); (6) a nine page copy of Boresha non-cancelled representatives in West Virginia, dated February 15, 2010 (exhibit A-V, Document 13-7); (7) a two page copy of two notices from Boresha re: West Virginia Conferences (May 8, 2014 and June 12, 2014, respectively) (Exhibit A-VI, Document 13-8); (8) a one page copy of an Affidavit from Todd McKinstry, undated (Exhibit A-VII, Document 13-9); (9) a three page copy of a brochure from Boresha with special offers for various dates (Exhibit A-VIII, Document 13-10); and (10) a two page copy of the Affidavit of Billy Hoover, dated June 10, 2014 (Exhibit A-IX, Document 13-11).

3        The Defendant attaches the following as exhibits to its reply to the response in opposition: (1) a four page copy of the Affidavit of Joseph Juliano, dated June 17, 2014 (Exhibit M, Document 16-2); (2) a three page copy of the Affidavit of Chelsea Kent, dated June 17, 2014 (Exhibit N, Document 16-3); (3) a nine page copy of an assortment of emails, dated December 10, 2012, December 12, 2012, April 8, 2013, March 29, 2013 and April 22, 2013, respectively (Exhibit O, Document 16-4); (4) a two page copy of a letter from Boresha to Billy Hoover, dated May 8, 2013, and accompanying FedEx tracking slip, undated (Exhibit P, Document 16-5); (5) a five page copy of the Affidavit of Mark P. Meuser, Esq., dated June 16, 2014 (Exhibit Q, Document 16-6); (6) a five page copy of the Affidavit of Len Di Giovanni, dated June 17, 2014 (Exhibit R, Document 16-7); (7) a twelve page copy of the Affidavit of Ronald J. Fichera, Esq., dated June 17, 2014 (Exhibit S, Document 16-8); and (8) a one page copy of three emails, dated January 21, 2104, February 21, 2014 and March 13, 2014, respectively (Exhibit T, Document 16-9).

*A. Factual Background*

The relationship between Mr. Boswell and Boresha allegedly began sometime in the summer of 2007. The Plaintiff claims that he was approached by management of Boresha to become a distributor for them, while Boresha claims that the Plaintiff approached them, through his affiliated company Millennium Force, by filling out an online application on Boresha's website to become an affiliated distributor. (*Accord* Document 10-1 at 5, Document 13-1 at 1.) Regardless, Mr. Boswell (or Millennium Force) started as a distributor for Boresha on August 6, 2007. (Document 10-1 at 6-7.) Mr. Boswell's status with Boresha was as an independent contractor at all times relevant to this dispute. (*See* Documents 10-4 at 5 & 10-2 at 1.)

Mr. Boswell claims that he met with George Najjar, the President of Boresha, in Huntington, West Virginia, sometime in October or November 2007 to discuss the existing business relationship. (Document 13-1 at 1.) As a result of that meeting, an agreement was fashioned whereby Mr. Boswell was to recruit and train distributors and independent business owners for Boresha, primarily in West Virginia, in exchange for bonuses and commissions, including two and a half (2 ½) percent of the company stock when 1,500 marketing consultants were registered with Boresha within the first eighteen (18) months of the agreement.[4] (*See* Document 10-4.) The parties further agreed that this agreement would be "construed in accordance with the laws of the State of California. In any action relating to the enforcement of this Agreement, jurisdiction and venue shall be proper only in the county of Contra Costa, State of California." (*Id.* at 7.) The Plaintiff claims that this contractual agreement was drafted by

---

[4]     Per the agreement, Mr. Boswell would be entitled to "another 2 ½% of company stock issued as of November 28, 2007, when [he] qualifies for the Regional Vice President Position with Boresha." (Document 10-4 at 1.)

Boresha in California and faxed to him for acceptance, which he did in West Virginia on December 3, 2007.  (Document 13-1 at 2.)

A subsequent agreement was reached between the parties after the first agreement terminated on or about December 1, 2008.  This agreement dictated that Mr. Boswell would receive 2% of the outstanding common stock of Boresha once he recruited and maintained 1,000 new active and qualified distributors.  (Document 10-5 at 1.)  The term of the agreement was eight (8) months, beginning on December 1, 2008, and ending on July 31, 2009.  (*Id.*)  This agreement also mandated that it shall be "interpreted and enforced in accordance with the laws of the State of California without regard to principles or conflicts of law provisions."  (*Id.* at 2.)  The Plaintiff claims that he signed the subsequent agreement just like the first agreement, personally, and "not as a distributor for Boresha."  (Document 13-1 at 2.)  The Plaintiff further alleges that the formation of the December 2008 agreement was identical to the November 2007 agreement, with the agreement drafted by Boresha in California and signed by Mr. Boswell in West Virginia.[5]

The Plaintiff then formed Cornerstone Marketing, LLC (Cornerstone) with another individual, Joseph Juliano, sometime in late 2008.[6]  (*See* Document 10-12 at 6.)  They, through Cornerstone, approached Boresha to become its Master Distributor, and on July 24, 2009, Cornerstone and Boresha agreed to pursue the relationship.  (See Document 10-6 at 1.)  The term of that agreement began on May 1, 2009, and ended on May 1, 2010.[7]  (*Id.*)  This agreement mandated that it "shall be integrated and enforced in accordance with the laws of the State of

---

5        The Plaintiff claims that he made some changes to this agreement, signed it, and faxed it back to Boresha.
6        Mr. Juliano and Mr. Boswell were to be 50/50 partners, with each owning fifty (50) percent of the company.
7        Notably, the agreement mandated that at the end of the term, May 1, 2010, Cornerstone would be granted the Master Distributor award.   (*See* Document 10-6 at 1.)

California without regard to principles of conflicts of law provisions." (*Id*. at 2.) As a Master Distributor, Cornerstone (with its partners) was responsible for "recruiting and maintaining a specific number of active distributors within a specified period of time, initiating and leading corporate trainings, meetings, and other promotional tasks." (Document 10-1 at 7.)

Also relevant to the instant dispute were Boresha's Policies and Procedures because they were "incorporated into the Boresha Independent Marketing Consultant Agreement." (Document 10-2 at 1.) This document lays out what is expected of the Independent Marketing Consultants, including general conduct, means of marketing, details on trademarks and copyrights, binary placement, and other relevant marketing distributing provisions. (*Id*. at 1-12.) This document also had a choice of law provision, stating that "[j]urisdiction and venue of any matter not subject to arbitration shall reside exclusively in Contra Costa County or the United States District Court for the Northern District of California . . . The law of the state of California shall govern all other matters relating to or arising from the Agreement." (*Id*. at 12.) Boresha claims that it sent a letter regarding the Policies and Procedures to both Mr. Boswell and Mr. Juliano on or about December 11, 2012. (*See* Document 10-7.) Mr. Boswell claims that he never saw nor read Boresha's policies and procedures, and further never received, read, nor signed the December 11, 2012 letter. (Document 13-1 at 2.) He claims that the signature on that letter is not his. (*Id*.)

Boresha contends that Mr. Boswell indeed had working knowledge of their Policies and Procedures. The former general counsel for Boresha, Mark Meuser, Esq., stated in his Affidavit that "Mr. Boswell was active with the distributors, and would call me up from time to time to discuss the Policies and Procedures in regard to some particular distributor." (Document 16-6 at 2.) Further, according to Mr. Meuser, Mr. Boswell "showed excellent knowledge of Boresha's

Policies and Procedures. He was able to cite paragraph numbers of the various policies while we were on the phone." (*Id.*) Mark Meuser then declared that "Mr. Boswell and I had at least ten phone calls and numerous emails regarding administration and enforcement of Boresha's Policies and Procedures." (*Id.*)

Boresha, and its officers, traveled to Huntington, West Virginia, sometime in late 2009 or early 2010 to promote their products and business model. "In attendance at that meeting for Boresha were George Najjar, President; Michael Babcock, Vice President; and Len Giovanni, CFO." (Document 13-1 at 3.) Apparently, the Plaintiff prepared a brochure for the seminar and presentation, which was then approved by Boresha through George Najjar and printed by the Plaintiff in Greenbrier County, West Virginia. (*Id.*) The Plaintiff avers that he also organized a number of events throughout West Virginia, and that the prepared fliers and promotional materials handed out at the events were always approved by Boresha, and further, that Boresha would email them to their distributors and potential distributors. (*Id.*)

Issues developed at Cornerstone between Mr. Boswell and Mr. Juliano, and Mr. Boswell approached Boresha in November 2013 to try to divest his interests in both companies so that he could exit the relationship(s) with Cornerstone and Boresha. As a result, a Memorandum of Understanding (MOU) was entered into between Mr. Boswell, Boresha, Cornerstone, and Mr. Juliano, on or about March 13, 2014. (*See* Document 10-8.) The parties agreed that Boresha would purchase Mr. Boswell's fifty (50) percent stake in Cornerstone, as well as buy back all interests in the Boresha stock that Mr. Boswell had earned during his time as a distributor. (*Id.* at 1-2.) The purpose of the MOU was to:

> fully and finally resolve any and all possible issues and claims whatsoever
> the aforementioned said Parties have or may have against each other, and all

future claims whatsoever pertaining to the stock ownership of Boswell with Boresha, the Kennard law suit, and the attempted sale of Boswell's ten (10%) percent entitlement in Cornerstone to Najjar (5%) and DiGiovanni (5%).

(*Id.* at 2.)   Importantly, the MOU also expressly stipulated that "this Agreement is pursuant to, and in accordance with, all the Policies and Procedures of Boresha."   (*Id.*)   The MOU also stated that "[t]his agreement shall be governed by and construed in accordance with the laws of the State of California."   (*Id.* at 7.)

The effectuation of the MOU was to take place via a California escrow company, Prominent Escrow. (*Id.*)   On or about April 7, 2014, Boresha—and not the escrow company—electronically transferred $150,000 per the MOU to Mr. Boswell's wife's checking account with First Citizens Bank.   (See Document 1 at 3.)   On or about April 10, 2014, Boresha "caused the $150,000.00 transferred to Plaintiff and deposited into his wife's account for his benefit to be wrongly debited from said account" contrary to the terms of the MOU calling for settlement within fifteen (15) days.   (*Id.*)

In between the two bank transactions above, Boresha wrote Mr. Boswell two letters.   (*See* Documents 10-10 & 10-11.)   The first letter, dated April 8, 2014, detailed certain revelations that had come to Boresha's attention after entering into the MOU with Mr. Boswell.   Specifically, Boresha accused Mr. Boswell of engaging in "fraudulent activities" which resulted in his arrest, all occurring before "the execution of the MOU."   (Document 10-10 at 1.)   Mr. Boswell was accused of defrauding an older couple out of money and property, and a newspaper article appearing in a local paper attested to those accusations.   (*See* Document 10-9.)   Based on this, Boresha advised Mr. Boswell that his relationships with it and Cornerstone were terminated per paragraphs 35 and 36 of the Policies and Procedures, and further, the MOU was terminated,

effective immediately.  (Id. at 2.)  Boresha also requested the return of the $150,000 payment under the terms of the MOU, and also made another formal demand for the return of any payments made to him as a Distributor since December 2013.  (*Id.* at 2-3.)  The second letter from Boresha to Mr. Boswell, dated April 10, 2014, advised Mr. Boswell that Boresha was proceeding to mediation in California with the American Arbitration Association, per certain clauses of the Policies and Procedures.  (Document 10-11 at 1.)

B.  *Procedural History*

On April 29, 2014, Mr. Boswell filed a four count *Complaint* (Document 1) in the United States District Court for the Southern District of West Virginia against Defendants Boresha and Cornerstone.  Count One alleges a breach of contract by Boresha, Count Two alleges a breach of contract by Cornerstone, Count Three alleges intentional infliction of emotional distress by Boresha, and Count Four alleges tortious interference with business expectancies by Boresha. (*See* Document 1 at 5-9.)  Mr. Boswell prays for compensatory damages and "damages for the reckless and wanton infliction of emotional distress and tortious interference with business expectancies of Plaintiff all in excess of $573,000.00."  (*Id*. at 9.)

On May 27, 2014, Boresha filed its *Motion to Dismiss or Alternatively Transfer Venue* and accompanying *Memorandum of Law in Support*.  Mr. Boswell filed his *Memorandum of Law in Response and Opposition* on June 10, 2014.  Cornerstone filed a *Joinder in Motion to Dismiss or Alternatively Transfer Venue* on June 16, 2014, and Boresha filed its *Reply* the next day, June 17, 2014.

## II.     STANDARD OF REVIEW

*A.  12(b)(2)-Personal Jurisdiction*

When a federal court's personal jurisdiction is challenged under Federal Rules of Civil Procedure 12(b)(2), it is ultimately the plaintiff's burden to prove that jurisdiction exists by a preponderance of the evidence.  *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,* 334 F.3d 390, 396 (4th Cir.2003) (citing *Mylan Labs, Inc. v. Akzo, N.V.,* 2 F.3d 56 (4th Cir.1993)). When the court addresses the jurisdictional question "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge."  *New Wellington Financial Corp. v. Flagship Resort Development Corp.,* 416 F.3d 290, 294 (4th Cir.2005).   "In determining whether the plaintiff has made the requisite showing, the court must construe all relevant allegations of the pleadings and draw all reasonable inference in favor of the existence of jurisdiction."  *Carefirst,* 334 F.3d at 396.

Two conditions must be satisfied for a district court to assert personal jurisdiction over a non-resident defendant: (1) A state long-arm jurisdiction statute must authorize jurisdiction over the non-resident defendant and (2) the court's exercise of personal jurisdiction over the non-resident defendant must "comport with the Due Process Clause" of the United States Constitution.  *Mylan Lab, Inc. v. Akzo, N.V.,* 2 F.3d 56, 59–60 (4th Cir.1993); *In re Celotex Corp.,* 124 F.3d 619, 627 (4th Cir.1997).   Since "the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary in this case to go through the normal two-step formula for determining the existence of personal jurisdiction."  *In re Celotex Corp.,* 124 F.3d at 627–28 (citation omitted); also see *York v. Property and Casualty Ins. Co. of Hartford,* 2013 WL

5504435 (S.D. W.Va. Oct. 3, 2013) (Goodwin, J.) ("the statutory inquiry merges with the constitutional inquiry, and the two inquires essentially become one.") Therefore, the Court's inquiry centers on whether the exercise of personal jurisdiction over the non-resident defendant is consistent with the Due Process Clause.

It is well established that the exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause "if the defendant has sufficient 'minimum contacts' with the forum such that requiring the defendant to defend its interests in the forum does not 'offend traditional notions of fair play and substantial justice.'" *In re Celotex Corp.,* 124 F.3d at 628 (*quoting International Shoe Co. v. Washington,* 326 U.S. 310, 316, (1945)). When assessing the "minimum contacts," courts should consider whether the defendant's contacts with the forum also provide the basis for the suit. *Carefirst,* 334 F.3d at 397.

If the defendant's contact with the forum state provides the basis for the suit, courts may exercise what is known as "specific jurisdiction." *Id.* To determine whether specific jurisdiction exists, the Court should consider the following: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id.* If the defendant's contact with the forum state does not provide the basis for the suit, a court may only exercise "general jurisdiction." *Id.* General jurisdiction is appropriate only where the defendant's contacts with the forum are "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415, (1984).

*B.   12(b)(3)-Venue*

The Defendants also move to dismiss for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure.   In this case, the Court's jurisdiction is founded solely on diversity of citizenship.   Thus, a civil action may be brought in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ..."   28 U.S.C. § 1391(a)(1)-(2).   When a defendant challenges improper venue under Rule 12(b)(3), "the plaintiff bears the burden of establishing that venue is proper."   *Bartholomew v. Va. Chiropractors Ass'n,* 612 F.2d 812, 816 (4th Cir. 1979)

For the purposes of venue, a corporation, like the Defendants here, "shall be deemed to reside . . .  in any judicial district in which such defendant is subject to the court's personal jurisdiction …"   28 U.S.C. § 1391(c)(2).   Although a corporation may only reside in two places, its principal place of business and its state of incorporation, for the determination of diversity jurisdiction, a corporation resides in every district in which it is subject to personal jurisdiction for venue purposes.   28 U.S.C. §§ 1391(c), 1332.


## III.    DISCUSSION

Defendant Boresha primarily argues that the complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) because "Plaintiff cannot establish sufficient minimum contacts to create personal jurisdiction under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)." (Document 11 at 8.)   It acknowledges that West Virginia's long arm statute is "broad, running coextensive to the statutory due process requirements," and thus, "the statutory and due process

analyses merge." (*Id.* at 9.) (citations omitted). Boresha claims that the Plaintiff's complaint fails because "merely conducting business through independent contractors in West Virginia does not satisfy West Virginia's Long-Arm Statute." (*Id.* at 10.) (citations omitted). It claims that distribution of its products by Mr. Boswell in West Virginia is likewise insufficient. Essentially, Boresha argues that the stream of commerce inquiry is inapplicable to the minimum contacts determination. (*Id.*) Further, the affidavit of an officer of Boresha avers that:

> On the contrary, Boresha is a California corporation, privately held and not publicly traded, and registered and qualified to do business in California. The headquarters, only offices, and operations of Boresha are all located in Walnut Creek, Contra Costa County, California. Boresha is not registered or otherwise qualified to do business in the State of West Virginia, and has no offices, employees, agent for service of process, or other physical presence [in West Virginia]. Boresha relies on independent, third-party contractors to market its products and recruit additional distributors. ... Given all this, Boresha has reasonably not had any expectation of being sued in West Virginia. Aff. of Di Giovanni, Exhibit A, ¶¶ 4-7, 10.

(Document 11 at 11.)

Boresha succinctly argues that neither general nor specific jurisdiction are satisfied in the instant dispute. It claims that it does not have continuous and systematic contacts with West Virginia because it has "no employees, offices, licenses, agent for service, or other permanent physical presence" in the state. (*Id.* at 12.) Boresha then maintains that there is no specific jurisdiction because the MOU, the agreement Plaintiff is suing under, was executed in California, and further, the transfers and sales were to be conducted through the California escrow company. (*Id.*) Boresha concludes that it has not purposely availed itself of the privileges of conducting activities in West Virginia, and, also, exercising jurisdiction would be constitutionally unreasonable because it would be "inconsistent with the Due Process Clause." (*Id.* at 13-14.)

Boresha argues that venue is improper here because neither of the Defendants reside in West Virginia and the entire sequence of events and actions calls for venue in California. (Document 11 at 15-16.)   It maintains that this Court should transfer the case to the Northern District of California for the convenience of the parties, and because the parties agreed to venue in California.   (*Id.* at 16-17.)   Boresha stresses that most of the witnesses reside in California, and the MOU executed between the parties calls for venue in California as it dictates that "this Agreement *shall be governed by* and construed in accordance with the laws of the State of California," and further, "the MOU expressly reincorporates the Policies and Procedures which provide" for venue in Contra Costa Country or the United States District Court for the Northern District of California.   (*Id.* at 17-18.) (emphasis in original)   Boresha also moves to dismiss the complaint "for improper venue under Rule 12(b)(3) and also under 28 U.S.C. 1406(a) because Boresha resides in California; the alleged acts or omissions occurred in California; and neither Defendant is subject to personal jurisdiction in West Virginia."   (*Id.*)

Mr. Boswell responds that Boresha is subject to both specific and general jurisdiction in West Virginia.   (Document 13 at 3.)   He stresses that "Boresha's contacts with West Virginia is the basis of this suit, therefore the Court can apply specific jurisdiction." (*Id.*)   Mr. Boswell argues that Boresha has purposefully availed itself of the laws and protections of West Virginia by making in person contact with him at a 2007 meeting attended by George Najjar, as well as when Boresha conducted a sales promotional meeting in Huntington, West Virginia, in late 2009 or early 2010.[8]   (*Id.* at 4.)   Mr. Boswell avers that Boresha made further personal contact when it sent contracts to West Virginia to be executed by him, and when Boresha "approved and directed

---

8        He also alleges that Boresha held a May 8, 2014 meeting in Hurricane, West Virginia, which Boresha's president, Tony Smith, attended.   (*See* Document 13 at 4.)

Plaintiff to have printed in West Virginia a brochure . . . to all distributors in West Virginia soliciting business for its new product line, SkinnyScience."   (*Id.*)

He states that Boresha reached into West Virginia over a seven (7) year period to solicit business "from internet retail customers ordering on-line by promotion directly to said customers …"   (*Id.* at 5.)   Mr. Boswell also believes that Boresha deliberately engaged in significant or long-term activities in West Virginia by: (1) directing him to recruit and train other distributors here, (2) shipping orders to distribution and retail customers "totaling hundreds of thousands of dollars," (3) "sending hundreds of thousands of e.mails (sic) to distributors and recruits in West Virginia since 2007" and (4) directing, through him, hundreds of training and recruitment events in West Virginia. (*Id.*)   In summation, Mr. Boswell argues that all of the above constitutes deliberate engagement by Boresha in significant and long term activities, the nature, quality and extent of which, subject it to specific jurisdiction.   He emphasizes that all of his obligations to Boresha "were to occur [in] West Virginia as well as other states."   (*Id.* at 6.)   Mr. Boswell claims that the facts at bar are similar those in "*Prestige Magazine Co., Inc. v. Panaprint, Inc.* (S.D. W.Va. 7-8-2009) and *Eastern Marketing v. Texas Meridian Prod., 798 F.Supp. 363* (S.D. W.Va. 1992)." (*Id.* at 6-7.)

He maintains that his claims arose out of Boresha's purposely directed activities in West Virginia because the MOU, as the "final contract to end all business relationships between the Plaintiff and Defendants," is dispositive and that all of the other contracts were not in effect at the execution of the MOU.   (*Id.* at 8-9.)   Mr. Boswell places great import on the fact that Boresha deposited the $150,000 in his wife's West Virginia checking account on April 7, 2014, and then

reached back and debited the money three days later.[9]  He argues that "Defendant Boresha breached the agreement in West Virginia by depositing the $150,000 in a bank in West Virginia, then removing same from the West Virginia bank."  (*Id.* at 9.)   He claims this was against West Virginia "social policy."   (*Id.* at 10.)

Mr. Boswell also argues that exercising jurisdiction over Boresha complies with constitutional principles because there would be no more burdens placed on Boresha now than it undertook willingly when it, and its officers, traveled to West Virginia for business meetings and promotional events.[10]  (*Id.* at 10-11.)   He acknowledges that the Defendants will incur some burden via travel, but not more than is manageable.   (*Id.* at 11-12.)   Mr. Boswell also stresses that Boresha should be subject to general jurisdiction as its contacts are continuous and systematic and it "has for many years contracted with hundreds of West Virginia residents for the buying and selling of their products."   (*Id.* at 12.)   He cites many of the same factors for general jurisdiction as he did for specific, including that Boresha actively solicited West Virginians to be distributors over multiple years.   (*Id.*)

Mr. Boswell states that venue is proper here because "a substantial part of the events or omissions giving rise to the claim occurred in West Virginia."   (*Id.* at 13.) (quotation omitted.) He stresses that while he has the burden of proving venue is proper in West Virginia, "only a prima facie showing is necessary to survive the motion to dismiss . . ."   (*Id.* at 14.)   He opposes transfer to the Northern District of California, arguing that having the case here will not work an undue

---

9        The Court notes that this was done in contravention to the parties' agreement in the MOU calling for use of the California escrow company.
10        Mr. Boswell also argues that "Defendant Cornerstone Marketing filed an answer to this action on May 27, 2014 and did not raise the defense of personal jurisdiction. Therefore, in accordance with *Duke Energy Industrial Sales v. Massey Coal Sales Co.*, . . . [Cornerstone] is deemed to have waived the defense of personal jurisdiction . . ." (Document 13 at 1.)

burden to Boresha on convenience or fairness grounds. (*Id.*) Mr. Boswell maintains that transferring venue to the Northern District of California would actually place the burden, inconvenience, and costs on him. (*Id.* at 15.) He concludes that "in the interest of justice, Plaintiff should [not] be made to bear the burden of a case in which the Defendant has breached a lawful and binding contract agreement of which a substantial part was made and to be performed within the State of West Virginia," and further, "the balance does not weigh heavily in favor of the Defendant and transferring venue . . ." (*Id.*)

Boresha replies simply that "there are not the continuous or systematic affiliations that render either foreign defendant 'at home' in West Virginia." (Document 16 at 1.) It stresses that the parties "agreed to California jurisdiction and venue in the subject [MOU] . . . by incorporating the Policies and Procedures . . . containing these provisions." (*Id.*) Boresha accuses Mr. Boswell of "making multiple false or misleading statements under oath" regarding the agreements entered into between the parties before the MOU. (*Id.*) It avers that Mr. Boswell signed the 2012 letter in front of multiple witnesses. (*Id.* at 2-3.) Boresha further contends that even if Mr. Boswell did not read or have a copy of the Policies and Procedures, he "knew about [them], knew he had to follow them, trained distributors on how to recruit and [on] following the Policies and Procedures, and actively participated in the administration and enforcement of the Policies." (*Id.* at 3.)

Boresha also stresses that the Plaintiff did sign an application to become a distributor of Boresha as he and his wife "have initiated or been directly associated with at least 11 Boresha distributorships . . .," and that each time he had to agree to Boresha's Policies and Procedures. (*Id.* at 3-4.)

It avers that the 2014 MOU was not a form contract, but instead the product of "15-20 drafts sent back and forth amongst the parties and then counsel, including plaintiff and his counsel Barry Bruce." (*Id.* at 4-5.) "Boresha included the Policies and Procedures to make sure all its provisions applied, including the California jurisdiction and venue provisions." (*Id.* at 5.) It also argues that the Plaintiff "had numerous emails and phone calls with [Boresha's] former general counsel, Mark Meuser, concerning the administration of the Policies and Procedures, discipline of distributors under [them], and how the venue provisions applied to various actual or potential disputes." (*Id.* at 4.) Boresha then submits several objections to Mr. Boswell's evidence and exhibits, including objections to the legal conclusions contained in the affidavits as irrelevant and improper, as well as asserting that the "affidavit of Todd McKinstry is undated and therefore invalid." (*Id.* at 5-6.)

Boresha continues to argue that its contacts were not systematic and continuous, but rather were intermittent and not enough to confer jurisdiction. (*Id.* at 6.) It then argues that Prestige Magazine Co. and Eastern Marketing, two cases Plaintiff cited in his response in opposition, are "readily distinguishable." (*Id.* at 7.) Interestingly, Boresha claims that "Boswell was not bound to perform any contractual obligations in West Virginia." (*Id.* at 8.) Further, "the plaintiff agreed to a California choice of law and venue provision, which should be afforded weight in this case," and thus, "California is the only appropriate venue for this action." (*Id.* at 8-9.)

Regarding the failure to use the California escrow company, Boresha maintains that "there was only agreement to do one payment outside of escrow," and not, as the Plaintiff wants the Court to believe, a "waive[r] [of] the California escrow." (*Id.* at 11.) The last several pages of Boresha's reply brief are filled with accusations that the Plaintiff lied under oath about signing the

agreements, lied about knowledge of the Policies and Procedures, and lied when he said that he was not bound to the terms of his bargained-for-exchange. (*Id.* at 12-14.) It claims that he should be equitably estopped from arguing the non-existence of a contract under which he personally reaped hundreds of thousands of dollars. (*Id.* at 14.) Boresha argues that Mr. Boswell "does not dispute, and thereby concedes, that this case is bound by California law, as provided in the MOU and Policies and Procedures." (*Id.*) It concludes with an analysis of both parties' potential witnesses in this matter, and avers that the Plaintiff's witnesses are not "percipient witnesses," and, therefore, should be afforded little weight in the determination of proper venue. (*Id.* at 14-15.)

As an initial matter, the parties concede that West Virginia's long-arm statute is "broad, running co-extensive to the statutory due process requirements," and "authorizes personal jurisdiction to the full reach of due process." (Documents 11 at 13; 13 at 6-7) (citations omitted.) Thus, the "Court's inquiry centers on whether exercising personal jurisdiction over [the defendant] is consistent with the Due Process Clause." (Document 11 at 14) (citation omitted.)

After considering all of the Plaintiff's arguments relative to Boresha's alleged contacts with West Virginia, and having construed all allegations in favor of the Plaintiff, the Court finds that Boresha purposefully directed activities towards West Virginia sufficient to meet the minimum contacts requirement. The Court makes this finding having given due consideration to all facts, including that Boresha has no agent, office, or property in West Virginia. The Court further finds that exercising personal jurisdiction over Boresha is consistent with the Constitution's Due Process Clause because of the minimum contacts Boresha had with the State of West Virginia. Contrary to Boresha's contention, here, it has done more than merely "conduct[ ] business" in

West Virginia or place products in the stream of commerce that would be eventually purchased in West Virginia. (See Document 11 at 14.)

Important to the Court's exercise of jurisdiction is the uncontested testimony that the President of Boresha, a high ranking official in Boresha, made personal contact when he flew to West Virginia and met with the Plaintiff sometime in October or November of 2007 to try to convince the Plaintiff to "recruit and train" future distributors in exchange for a percentage of Boresha stock. (See Document 13 at 1-2.) It is also uncontested that another President of Boresha, Tony Smith, visited West Virginia on May 8, 2014 to meet with distributors. These acts are analogous to the finding of purposeful availment present in *Prestige Magazine Co., Inc. v. Panaprint, Inc.*, No. 3:09-0314, 2009 WL 2029791, *3 (S.D. W. Va. July 8, 2009) (Chambers, J.) (finding purposeful availment when, among other acts, the defendant, a Georgia printing company, "sent a high-ranking official to West Virginia" to negotiate a contract with a West Virginia company.) Further buttressing the Court's finding is that numerous corporate officers of Boresha likewise made personal contact when they were physically present in West Virginia by holding conferences on multiple occasions where they were actively recruiting future employees and showcasing their products and business structure. These facts are, again, uncontested. Additionally, when considering the nature of the parties' agreement and the other contacts with the state, Boresha's depositing and then debiting approximately $150,000 in and from a West Virginia account, held by a West Virginia resident, adds weight to the finding that Boresha purposely availed itself of the benefits and protections of West Virginia law.

While Boresha claims that "plaintiff Boswell was not bound to perform any contractual obligations in West Virginia," the uncontested facts undercut this argument.[11]   (Document 16 at 8.)  Mr. Boswell prepared numerous flyers and brochures under the direction, and subject to the approval of, Boresha.  Those same flyers were distributed at the conferences and meetings in West Virginia.  Uncontested evidence advanced by the Plaintiff indicates that he recruited and trained over seven hundred (700) distributors in West Virginia, pursuant to the terms of his agreement with Boresha.   Thus, the Court finds that Boresha is subject to personal jurisdiction in the State of West Virginia and that this exercise does not offend traditional notions of fair play and substantial justice.[12]

Even though the Court has found that exercising jurisdiction over the Defendant is appropriate in this instance, the Defendant alternatively requests that this Court transfer the matter to the United States District Court for the Northern District of California.   (Document 11 at 16.)  Boresha principally relies on the parties' agreement "to California venue in the MOU and other [incorporated] governing documents," and further contends that "the interests of justice favor the transfer as most of the witnesses are located within the Northern District of California."   (*Id.* at 17.)   It argues that "[a] forum-selection 'may be enforced through a motion to transfer under § 1404(a)."   (*Id.*) (citing *Atlantic Marine Construction Co. v. United States District Court*, 134

---

11      The Court notes that while Boresha classifies its employees as independent contractors, it nevertheless held a great deal of control over their methods, including, for instance, that the Distributors at all times follow Boresha's Policies and Procedures.

12      The Court also finds that Mr. Boswell's argument that Cornerstone waived any challenge to jurisdiction and therefore consented to jurisdiction in this court is unavailing.   Cornerstone was not represented by counsel until August 12, 2014 (*See* Notice of Appearance, Document 26), which was in response to the Court's July 30, 2014 Order (Document 25).   Any documents filed by Cornerstone up to the point it retained counsel are without effect as corporations, including partnerships, "may appear in the federal courts only through licensed counsel. *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-02 (1993) (citing *Osborn v. President of Bank of United States*, 9 Wheat. 738, 829, 6 L.Ed. 204 (1824)."   (See Document 25 at 1.)   The Court also notes that even if Cornerstone waived jurisdiction, the Court would still transfer the matter based on improper venue and the parties' written agreement (MOU).

S.Ct. 568, 569 (2013). The Court agrees with the Defendant, and finds that this matter should be transferred to the United States District Court for the Northern District of California.

It is uncontested that the Plaintiff is suing under the MOU. As mentioned, *supra*, the MOU expressly stipulates that "this Agreement is pursuant to, and in accordance with, all the Policies and Procedures of Boresha." (Document 10-8 at 2.) The MOU also states that "[t]his agreement shall be governed by and construed in accordance with the laws of the State of California." (*Id.* at 7.) The Policies and Procedures state that "[j]urisdiction and venue of any matter not subject to arbitration shall reside exclusively in Contra Costa County or the United States District Court for the Northern District of California . . . The law of the state of California shall govern all other matters relating to or arising from the Agreement." (Document 10-2 at 12.) While Mr. Boswell claims that he never saw or read Boresha's Policies and Procedures, the evidence of the case, as well as basic contract doctrines, belie this contention.

Additionally, the Court notes that the previous agreements between the parties either expressly called for venue and jurisdiction to be in the County of Contra Costa County, California, or the United States District Court for the Northern District of California, or called for them to be interpreted and enforced under the laws of the State of California. (*See* Documents 10-3 at § 14; 10-4 at 7; 10-5 at 2; and 10-6 at 2.)

Moreover, it is undisputed that the MOU expressly incorporated by reference Boresha's Policies and Procedures. If they were not known to Mr. Boswell before entering into the MOU, they should have been read, requested, or questioned during negotiations as they were readily ascertainable. "Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and

21

incorporation of the document will not result in surprise or hardship." *Logan & Kanawha Coal Co., LLC v. Detherage Coal Sales, LLC*, 514 Fed.Appx. 365, 367-68 (4th Cir. 2013) (citing *Standard Bent Glass Corp. v. Glassrobots Oy,* 333 F.3d 440, 447 (3rd Cir. 2003)). Thus, the Court finds that the plain terms of the parties' MOU make express reference to and incorporate Boresha's Policies and Procedures, and, additionally, incorporating them would not work surprise or hardship on Boswell based on the parties' prior course of dealing.

It is likewise undisputed that Mr. Boswell signed the agreement after several rounds of back-and-forth negotiations, during which he was represented by counsel. As the Fourth Circuit noted in *L & E Corp. v. Days Inn of America, Inc.*:

> "It is the function of the court to construe the contract made by the parties, not to make a contract for them, or to alter the contract they have made so as to conform it to the court's notion of the contract they should have made in view of the subject matter and the surrounding facts and circumstances.... It is the court's duty to declare what the *instrument itself* says it says."

*L & E Corp.*, 992 F.2d at 58 (citing *Ames v. American Nat'l Bank,* 163 Va. 1, 176 S.E. 204, 216 (1934) (emphasis in original). "There is no requirement that the more sophisticated party to a contract offer the less sophisticated party an oral explanation of the terms of the contract . . ." *Adkins v. Labor Ready, Inc.*, 195 F.Supp.2d 628, 638 (S.D. W.Va. 2001) (aff'd at 303 F.3d 496 (4th Cir. 2002)).

There likewise has been no challenge from Mr. Boswell to the contention that the negotiations between the parties leading up to the MOU were conducted at arms' length. Mr. Boswell freely entered into the MOU with Boresha, with the aid of his counsel, and must now be held to its terms and requirements. This matter could have and should have been filed in the Northern District of California per the parties' MOU. Thus, the Court finds that this matter must

be transferred to the United States District Court for the Northern District of California in the interests of justice per the parties' forum selection clause placing ""[j]urisdiction and venue of any matter not subject to arbitration . . . exclusively in Contra Costa County or the United States District Court for the Northern District of California."

Even assuming *arguendo* that this Court lacked personal jurisdiction over Boresha, 28 U.S.C. § 1631 still allows transfer to the Northern District of California.   That section states:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought.

28 U.S.C. § 1631.   Thus, even if the Court had found that Boresha lacked minimum contacts with the State of West Virginia, it would still transfer the action to the Northern District of California in the interest of justice because the parties agreed to jurisdiction and venue in California per the plainly worded MOU that incorporated Boresha's Policies and Procedures.


**CONCLUSION**

Wherefore, after careful consideration, the Court **ORDERS** that the *Defendant Boresha International, Inc.'s Motion to Dismiss or Alternatively Transfer Venue* (Document 10) be **GRANTED in part and DENIED in part**.   Specifically, the Court **ORDERS** that the Defendants' motion be **DENIED** as it relates to dismissal and **GRANTED** as it relates to transfer of venue.   The Court further **ORDERS** that the Clerk of the Court **TRANSFER** this matter to the **United States District Court for the Northern District of California**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to the Clerk of the Court for the United States District Court for the Northern District of California, to counsel of record, and to any unrepresented party.

ENTER:      September 4, 2014

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA